IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

v.

GUSTAVO OLIVARES-RANGEL,

    Defendant.                                                               Cr. No. 04-528 RB(ACE)

## DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

COMES NOW Defendant, GUSTAVO OLIVARES-RANGEL, by and through his attorney, Barbara A. Mandel, and submits the following Proposed Findings of Fact and Conclusions of Law, as requested by the Court after the evidentiary hearing held on June 8, 2004.

### PROPOSED FINDINGS OF FACT

1.    Agent Armendariz is a Border Patrol agent who is familiar with the Vado, New Mexico, area. Tr. at 5.[1]

2.    Approximately two or three weeks before Defendant's arrest on February 2, 2004, Agent Armendariz and Agent Marshall received information about some illegal aliens living in a trailer in Vado and perhaps engaging in criminal activity. Tr. at 6, 7.

---

[1] Page references are to the transcript of the evidentiary hearing held June 8, 2004.

3. Agent Armendariz and Agent Marshall received the information from an illegal alien whom the two agents had arrested and who was voluntarily returned to Mexico. Tr. at 61-62.

4. The agents had no knowledge concerning the reliability of the informant's information. Tr. at 18-19.

5. The confidential informant did not identify the alleged illegal aliens or Mr. Olivares-Rangel by name. Tr. at 7.

6. The agents did not corroborate the informant's information with other law enforcement officers or with residents of Vado. Tr. at 18-19.

7. Sonia Delgado, a resident of Vado, was not aware of any criminal activity in her neighborhood at the time, and would have heard about such activity if it had occurred. Tr. at 78.

8. Agent Armendariz claimed to have visited the property where the trailer was located several times during the weeks immediately preceding the arrest, attempting to investigate the information, but hadn't spoken with anyone. Tr. at 8, 50.

9. On February 2, 2004, Agents Armendariz and Marshall drove towards the property at about 10 a.m. Tr. at 8.

10. The property is located on Estancia north of Presa. Tr. at 84-85.

11. The agents approached the property by driving north on Estancia from Presa. Tr. at 47.

12. The property is surrounded by a fence, and there is a gate at the entrance. There is a residence near the gate and three or four mobile homes at the rear of the property. Tr. at 25.

13. The entrance and gate to the property are clearly visible for some distance to a driver approaching on Estancia from Presa. Tr. at 25, Exhibits B, C, D.

14. There are no buildings, trees, or other things obscuring the view of the entrance to the property. Tr. at 57-58, Exhibit B.

15. The agents were driving an unmarked Ford Expedition. Tr. at 11.

16. Agent Armendariz was driving slowly on Estancia towards the driveway into the property. Tr. at 66.

17. Agent Armendariz is a careful driver. Tr. at 65.

18. Defendant Gustavo Olivares-Rangel was a passenger in a green pick-up truck whose driver was attempting to leave the property at about 10:00 a.m. on February 2, 2004. Tr. at 8-9, 50.

19. Agent Armendariz's testimony that he could not see the green truck in which Defendant was riding before he turned into the driveway and came "bumper to bumper" with the pickup truck is not credible because the photographs of the area and the agents' testimony demonstrate that vehicles in the driveway of the property are clearly visible as a person drives northward on Estancia from Presa. Tr. at 57-58, Exhibits B, C, D.

20.     The agents claimed to have gone to Vado to follow up on the information from the informant. Tr. at 49.

21.     The entrance to the property was not wide enough for two vehicles. Tr. at 54, 80.

22.     Agent Armendariz's testimony that, if he had realized that both vehicles could not fit, he would have waited for the pickup truck to exit the trailer park before he turned into the driveway, see Tr. at 57, is not credible, because he testified he had previously driven into the trailer park and looked around. Tr. at 50.

23.     Estancia is a dirt road. Tr. at 54.

24.     The agents intended to question anyone they could find in the trailer park in an attempt to investigate the information. Tr. at 68-69.

25.     Since the agents intended to question people and they knew there were people in the pickup truck, and this was the first time they had seen anyone to question, the Court finds that Agent Armendariz intended to stop and question the occupants of the pickup truck as he approached them and before they exited the driveway.

26.     Sofia Delgado was a witness to the arrest of Mr. Olivares-Rangel. Tr. at 76.

27.     Sofia Delgado saw the agent's white truck in Estancia parallel to driveway and blocking the truck's exit. Tr. at 77-78.

28.     Sofia Delgado was a credible witness.

29. The Court finds that Agent Armendariz blocked the driveway and did not allow the green truck to exit before he questioned the occupants. Tr. at 17.

30. Agent Armendariz did not recognize Mr. Olivares-Rangel as a person he had previously arrested and deported until after he had stopped the pickup in which Mr. Olivares-Rangel was riding. Tr. at 9, 17.

31. The agents questioned the occupants about their citizenship, but did not further investigate any other alleged criminal activity by them. Tr. at 9-10.

32. Mr. Olivares-Rangel was never free to leave once Agent Armendariz saw him. Tr. at 33, 42.

33. Agent Armendariz questioned Mr. Olivares-Rangel about his identity and citizenship, without giving him *Miranda* warnings, immediately after he was seized. Tr. at 11.

34. It was only after Agent Armendariz questioned Mr. Olivares-Rangel that he verified Mr. Olivares-Rangel was in the United States illegally. Tr. at 10-11.

35. Mr. Olivares-Rangel's fingerprints were obtained at the Border Patrol Station. They were used to connect him to his immigration record and prior criminal record. Tr. at 43.

36. These records were the bases for obtaining incriminating admissions from Mr. Olivares-Rangel and for proving the elements of the crime with which he is charged, illegal reentry after deportation. Tr. at 10-11, 39, 43.

37. The information received from the informant was not corroborated or reliable and did not provide a reason for the agents to detain the occupants of the green truck. Tr. at 66.

38. Agent Armendariz intended to stop the green truck as soon as he saw it, either to question the occupants about their citizenship or to investigate the unreliable tip.

### PROPOSED CONCLUSIONS OF LAW

1. Mr. Olivares-Rangel was seized when Agents Armendariz and Marshall prevented the truck in which he was a passenger from leaving the trailer property. *See United States v. Tuley*, 161 F.3d 513, 515 (8th Cir. 1998) ("We conclude that blocking [defendant]'s truck with the squad car resulted in a Fourth Amendment seizure."); *United States v. Gama-Bastidas*, 142 F.3d 1233, 1239 (10th Cir. 1998) ("It is undisputed that stopping an automobile and detaining its occupants constitutes a seizure within the meaning of the Fourth Amendment.").

2. The evidence at the hearing proved that Agent Armendariz seized the vehicle in which Mr. Olivares-Rangel was riding without reasonable suspicion, because prior to the seizure, Agent Armendariz had no reliable information that anybody in the vehicle was committing a crime or was illegally present within the United States. The seizure therefore violated the Fourth Amendment, which applies to roving patrol stops by Border Patrol agents. *See United States v. Brignoni-Ponce*, 422 U.S. 873 (1975); *Almeida-Sanchez v. United States*, 413 U.S. 266 (1973).

3. When law enforcement officers obtain evidence in violation of the Fourth Amendment, the exclusionary rule generally precludes its use in a criminal prosecution against the victim of the illegal seizure. *Illinois v. Krull*, 480 U.S. 340, 347 (1987) (citing *Weeks v. United States*, 232 U.S. 383 (1914)).

4. The exclusionary remedy extends not only to the primary evidence obtained from the illegal seizure, but also to the indirect product of the seizure, the secondary evidence or the "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471, 484 (1963); *Nardone v. United States*, 308 U.S. 338, 341 (1939); *Silverthorne Lumber Co. v. United States*, 251 U.S. 385 (1920).

5. When law enforcement officers obtain evidence in violation of the Fourth Amendment, not only must the evidence illegally obtained itself be excluded, but evidence located as a result of information secured by an illegal search is likewise inadmissible. *Silverthorne Lumber Co., supra*; *Nardone, supra*.

6. The exclusionary rule and Fourth Amendment principles apply to stops by Border Patrol agents. *Brignoni-Ponce, supra*; *Almeida-Sanchez, supra*.

7. Where law enforcement officials discover the defendant's identity and connection to illicit activity solely because of the illegal detention, any evidence obtained as a result of that illegal detention must be suppressed. *Davis v. Mississippi*, 394 U.S. 721 (1969).

8. Fingerprints obtained as a result of constitutional violations and used for investigatory purposes must be suppressed in the criminal case flowing from that investigation. *Hayes v. Florida*, 470 U.S. 817 (1985). *Davis v. Mississippi*, 394 U.S. 721 (1969).

9. In *United States v. Guevara-Martinez*, 262 F.3d 757 (8th Cir. 2000), the Court held that the defendant's fingerprints, obtained by exploiting the defendant's detention following an illegal traffic stop and arrest, must be suppressed in a subsequent prosecution for being an illegal alien in the United States. In so ruling, the Court distinguished between jurisdictional challenges to identity evidence, *see INS v. Lopez-Mendoza*, 468 U.S. 1032, 1039 (1984) (body or identity of alleged alien not suppressible in civil deportation proceeding), and evidentiary challenges to fingerprint evidence in criminal cases, *see Davis, supra*; *Hayes, supra*.

10. As in *Davis*, *Hayes*, and *Guevara-Martinez*, the evidence of Mr. Olivares-Rangel's identity, including his name and fingerprints and the agents' knowledge of his presence in the United States, must be suppressed. Agent Armendariz had no knowledge that Mr. Olivares-Rangel was in the United States before he stopped the truck and then recognized Mr. Olivares-Rangel in it. Mr. Olivares-Rangel was illegally detained before Agent Armendariz obtained any incriminating evidence about him and before Agent Armendariz had any reason to look up Mr. Olivares-Rangel's immigration and criminal records. Just as the unlawfully obtained fingerprints obtained in *Davis* could not be used to

8

link the defendant to evidence at the crime scene, the identity evidence that was unlawfully seized from Mr. Olivares-Rangel cannot be used to prove Mr. Olivares-Rangel's presence in the United States or to tie Mr. Olivares-Rangel to his criminal and immigration records.

11. *INS v. Lopez-Mendoza* does not apply in this case because the Court retains jurisdiction over Mr. Olivares-Rangel and this is not a civil deportation proceeding, but is a criminal proceeding. In all criminal cases, unlawfully seized evidence can be suppressed.

12. The exclusionary rule is a "judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." *United States v. Calandra*, 414 U.S. 338, 348 (1974). Deterrence has always been the aim of the exclusionary rule. *See Mapp v. Ohio*, 367 U.S. 643, 657-660 (1961). Deterrence is so central to the exclusionary rule's purpose that courts will refuse to apply it even following manifestly illegal searches, seizures, or arrests, when applying the rule would not serve to deter police misconduct. *See Arizona v. Evans*, 514 U.S. 1, 14-16 (1995); *United States v. Leon*, 468 U.S. 897 (1984). Conversely, when applying the rule will serve its deterrent goal, courts will enforce it strictly. The Supreme Court made this plain more than eighty years ago in a decision that remains unquestioned:

> The essence of a provision forbidding the acquisition of evidence in a certain way is not merely that evidence so acquired shall not be used before Court but that it shall not be used at all. Of course, this does not mean that the facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source, they may be proved like any others, but the knowledge gained by the Government's own wrong cannot be used by it in the way proposed.

*Silverthorne Lumber Co. v. United States*, 257 U.S. 385, 392 (1920).

13.     Suppression of the statements and fingerprints proving Mr. Olivares-Rangel's identity, as well as Agent Armendariz's recognition of him and the records located as a result of obtaining the identity evidence, is required because of the deterrent purpose of the exclusionary rule: Border Patrol and other law enforcement officers would be put on notice that similar conduct in future cases would be counterproductive. This is not a case of independent source or inevitable discovery. The illegal seizure of Mr. Olivares-Rangel, followed by Agent Armendariz's recognition of him and the fingerprints and statements seized from him for investigatory purposes, are the but-for causes of the charges against Mr. Olivares-Rangel.

14.     To rule that Mr. Olivares-Rangel's fingerprints, statements, and other unlawfully obtained evidence of his identity cannot be suppressed effectively establishes a class of criminal prosecutions to which the exclusionary rule does not apply, illegal reentry after deportation cases. To obtain a conviction under 8 U.S.C. § 1326 for illegal reentry after deportation, the Government must prove only that the defendant: (1) is an alien; (2) was previously arrested and deported; (3) was thereafter found in the United States; and (4) lacked the permission of the appropriate authority. *United States v. Meraz-Valeta*, 26 F.3d 992, 997 (10th Cir. 1994). The main evidence to support the Government's case against Mr. Olivares-Rangel will be his identity and the immigration records located using that name. If a defendant's identity is ascertained solely as the result of a Fourth Amendment violation,

the Government, consistent with Fourth Amendment principles and the exclusionary rule, should not be allowed to use the information in its case-in-chief against the defendant. A decision to allow the Government to nonetheless use unlawfully obtained evidence undermines the purpose of the exclusionary rule, rendering the protection of the Fourth Amendment of no value and effectively striking it from the Constitution in cases where an unlawful stop leads to a prosecution for illegal reentry. *See Weeks*, 232 U.S. at 394-94 (stating that if trial courts admit illegally obtained evidence, the protection of the Fourth Amendment is rendered of no value; to approve police conduct after the fact "affirm[s] by judicial decision a manifest neglect if not an open defiance of the prohibitions of the Constitution ....").

15.    The Supreme Court has recognized that "[t]o forbid the direct use of methods thus characterized but to put no curb on their full indirect use would only invite the very methods deemed 'inconsistent with ethical standards and destructive of personal liberty.'" *Nardone*, 308 U.S. at 340. Failure to suppress the evidence obtained in this case would effectively approve the Border Patrol agents' flagrant violation of the Fourth Amendment because the Government would be able to use all the evidence obtained as a direct result of the constitutional violation to obtain a criminal conviction against Mr. Olivares-Rangel, as well as to deport him.

16.    Accordingly, the Court concludes that Mr. Olivares-Rangel was stopped without reasonable suspicion or probable cause, and therefore all statements and fingerprints

seized from him, as well as the immigration and criminal records located using that evidence of identity, cannot be used in the prosecution against him.

17.    "The exclusionary rule was fashioned as a sanction to redress and deter overreaching governmental conduct prohibited by the Fourth Amendment." *Davis*, 394 U.S. at 724.  "Our decisions recognize no exception to the rule that illegally seized evidence is inadmissible at trial, however relevant and trustworthy the seized evidence may be as an item of proof."  *Id.*   There is no exception in *Lopez-Mendoza* for statements of identity and associated evidence, nor is there a blanket exception for immigration records.

WHEREFORE, Defendant respectfully prays that the Court adopts the foregoing proposed Findings of Fact and Conclusions of Law, and suppresses all evidence obtained as a result of the Fourth Amendment violation.

                                            Respectfully submitted,

                                            FEDERAL PUBLIC DEFENDER
                                            500 S. Main, Suite 600
                                            Las Cruces, New Mexico  88001
                                            (505) 527-6930

                                            By: (Electronically Filed)
                                                 BARBARA A. MANDEL
                                                 Assistant Federal Public Defender

## **CERTIFICATE OF SERVICE**

     I hereby certify that a true copy of the foregoing pleading has been served on Assistant U.S. Attorney Mark Saltman by placing same in the United States Attorney's box in the Federal Courthouse in Las Cruces, New Mexico on this 22nd day of June, 2004.

                                  (Electronically Filed)
                                  BARBARA A. MANDEL
                                  Assistant Federal Public Defender