# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

     Plaintiff,

v.                                       CR. No. 04-528 RB

GUSTAVO OLIVARES-RANGEL,

     Defendant.

## UNITED STATES' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

COMES NOW, the United States of America, by and through its attorneys of record, David C. Iglesias, United States Attorney for the District of New Mexico, and Mark A. Saltman, Special Assistant United States Attorney for said District, and submits the following Proposed Findings of Fact and Conclusions of Law.

## PROPOSED FINDINGS OF FACT

1.    Agent Luis Armendariz is an agent with the Department of Customs and Border Protection, Border Patrol, and he has worked for the Border Patrol for approximately 12-1/2 years. Tr. at 4.[1]

2.    Agent Mark Marshall is an agent with the United States Department of Customs and Border Protection, Border Patrol, and was partners with Agent Armendariz for four months including January and February, 2004. Tr. at 61.

3.    In January, 2004, Agents Armendariz, and Marshall were working together in

---

[1]Page references are to the transcript of the evidentiary hearing held on June 8, 2004.

Vado, New Mexico, and met a legal resident alien that gave them some very specific information about illegal aliens living in a trailer park, in a particular trailer, who were burglarizing homes, and engaging in other criminal mischief. Tr. at 6-7.  The resident alien was able to show the two agents the particular trailer, and said that the illegal aliens living there were previously caught in Berino, New Mexico, and deported to Mexico. Tr. at 6-7, 21.

4.       After Agents Armendariz, and Marshall received this tip, they made several trips to the trailer park, and drove around the trailer park hoping to find somebody to talk to about what they learned, and to maybe question the residents of the trailer that the resident alien source identified, but they did not have any luck. Tr. at 8.

5.       On February 2, 2004, Agents Armendariz, and Marshall decided to visit the trailer park again to follow up on the tip they received from the resident alien source. Tr. at 8, 50.

6.       Agent Armendariz was driving a white in color unmarked Expedition, and Agent Marshall was a passenger in the Expedition. Tr. at 11.

7.       At approximately 10:00 a.m., Agent Armendariz executed a turn into the driveway of the trailer park,  and accidently met bumper to bumper with a Chevy pickup truck that was exiting the trailer park. Tr. at 8-9.

8.       According to Sofia Delgado, a witness for the Defendant, and a resident of Vado who lives at the end of the trailer park driveway, the driveway is narrow, and it is very difficult for two cars to travel on the driveway at the same time. Tr. at 80.

9.       The driveway to the trailer park is located off of Estancia Street which is a dirt

road that Agent Armendariz traveled at approximately 30 miles per hour on February 2, 2004. Exhibits B, C, and D. Tr. at 9, 56-57. Agent Armendariz does not remember what direction he was traveling on Estancia en route to the trailer park, but there are homes, and trees in both directions. Defendant's Exhibits B, C, and D. Tr. at 49, 83. Agent Marshall does not remember what direction they were traveling either. Tr. at 66.

10.     There is also a house at the corner of Estancia, and the trailer park driveway that is surrounded by a fence, and has a gate which could obstruct one's view of the trailer park driveway. Defendant's Exhibit A, Tr. 76-77.

11.     If a driver were traveling on Estancia in either direction, and  looking at the driveway to the trailer home, rather than the road he were traveling on, he might be able to see a vehicle driving down the trailer park driveway to exit the trailer park, depending on the location of his vehicle, and the other vehicle, and whether his sight were obstructed.  Defendant's Exhibits B, C, and D.

12.     Conversely, a driver driving down the trailer park driveway to exit the trailer park might be able to see a vehicle traveling on Estancia, and then execute a turn onto the trailer park driveway depending on the location of his vehicle, the other vehicle, and whether his sight was obstructed. Defendant's Exhibits B, C, and D.

13.     There is no evidence in this case about whether the Defendant, or the driver of the Chevy saw the white Expedition, or testimony that Agent Armendariz or Agent Marshall saw the Chevy before Agent Armendariz executed his turn on to the trailer park driveway.

14.     Agent Armendariz first saw the Chevy when he executed his turn into the trailer park driveway. Tr. at 59. Agent Marshall also first saw the Chevy when Agent Armendariz executed the turn, and "was like Oops" when the two vehicles met bumper to bumper. Tr. at 63. Agent Marshall does not think that Agent Armendariz saw the Chevy before he executed his turn into the trailer park driveway because it was a surprise to Agent Marshall. Tr. at 65.

15.     If Agent Armendariz saw the Chevy before he executed his turn, and knew that the two vehicles would not have been able to pass each other, Agent Armendariz would have waited for the Chevy to exit the trailer park before executing his turn into the trailer park. Tr. at 57.

16.     Agent Armendariz did not intend to stop the Chevy's exit from the trailer park.. Tr. at 50.

17.     When the Expedition, and the Chevy met in the trailer park driveway, and after Agent Marshall "was like Oops, " Agent Armendariz immediately recognized the Defendant who was sitting in the cab of the pickup truck as somebody he arrested a month or two prior for being in the United States illegally. Tr. at 9.

18.     When Agent Armendariz recognized the Defendant, he told Agent Marshall something to the effect of "[H]ey, I recognize that guy. I caught him before." Tr. at 9.

19.     Agent Marshall then said something to the effect of "[R]eally? Well, we should probably talk to them then, huh?" Tr. at 63.

20.     Agent Marshall approached the driver's side of the Chevy, and Agent Armendariz

approached the passenger side of the Chevy, and both engaged the occupants of the Chevy. Tr. at 63.

21.   When Agents Armendariz, and Marshall approached the Chevy, the only person, in Agent Armenariz's mind, that was not free to leave was the Defendant because he already knew that he was in the United States illegally. Tr. at 31.

22.   The Defendant readily admitted that he was a Mexican citizen illegally in the United States, and he was placed under arrest for being in the county illegally, and was transported to the Border Patrol Station for processing. Tr. at 10.

23.   At the Border Patrol station, Agent Armendariz asked the Defendant for his biographical information, and enrolled him in the IDENT system.  Tr. at 11.

24.   The IDENT system revealed that the Defendant was a previously deported criminal alien. Tr. at 11.

25.   Agent Armendariz processed the Defendant as an illegal reentry after deportation, and advised the Defendant of his *Miranda* rights. Tr. at 11.

26.   Agent Armendariz had no further communication with the Defendant. Tr. at 11.

27.   At approximately 10:00 a.m., Sofia Delgado, a resident of Vado who lives in a trailer at the corner of Estancia, and the trailer park driveway, heard a car door slam, and looked out a window and saw a green truck in the driveway, and "they were already putting guys in the back." Tr. at 76. She also saw a white van that was parked on Estancia that was blocking the driveway. Tr. at 77.

28.   After Agent Armendariz, and Agent Marshall placed the Defendant, and his three occupants under arrest, they transported them to the Border Patrol station. Tr. at

10. Prior to transporting the Defendant, and his companions, either Agent Armendariz, or Agent Marshll moved the Expedition from the driveway around the time the Chevy was driven back to a trailer. Tr. at 86.

29.    Sofia Delgado is a credible witness, but she did not see where the Expedition, and the Chevy met bumper to bumper. She only saw what happened after Agents Armendariz, and Marshall questioned the Defendant, and his occupants, and moved the Expedition before putting them in the back to transport them to the Border Patrol Station.

## PROPOSED CONCLUSIONS OF LAW

1.    Agent Armendariz had reasonable suspicion to seize the Defendant when he recognized him as somebody he arrested previously for being in the United States illegally. *See Terry v. Ohio*, 392 U.S. 1, 22-24 (1968). Such an investigative detention requires that specific and articulable facts, together with rational inferences drawn from those facts, reasonably suggests criminal activity. *See id.* at 26-27. Because Agent Armendariz had specific, and personal knowledge that the Defendant was engaged in criminal activity, i.e., being in the country illegally, reasonable suspicion was present when he exited his Expedition and approached the Chevy to confirm his suspicion.

2.    When Agent Armendariz and Agent Marshall approached the Chevy, and engaged the Defendant in English, he was not entitled to *Miranda* warnings because at that time the Defendant was not in custody and he was not subject to interrogation. *Miranda v. Arizona*, 384 U.S. 444 . *Miranda* requires that, before questioning a

suspect in custody, law enforcement officials must inform him of his *Miranda* warnings. *Id* at 467.

3.   A person is not in custody for *Miranda* purposes unless his freedom of action is curtailed to a degree associated with formal arrest.  Furthermore, *Miranda*'s "in custody" requirement is measured objectively, the proper inquiry being whether a reasonable [person] in the suspect's position would have understood his situation ... as the functional equivalent of formal arrest.  Finally, [this] reasonable person does not have a guilty state of mind and does not have peculiar mental or emotional conditions that are not apparent to the questioning officer. *United States v. Hudson*, 210 F.3d 1184, 1190 (10th Cir. 2000). In this case, the Defendant was not in custody when he was asked about his citizenship because he was not under formal arrest, or its functional equivalent.

4.   There is not a "restraint on freedom of movement to the degree associated with a formal arrest" when a person was detained pursuant to a routine traffic stop. *Berkemer v. McCarty*, 468 U.S. 420, 441 (1984). In this case, the testimony from the two agents was that the initial encounter with the Chevy was accidental. However, if the Defendant does not believe that, then the encounter is most likely akin to a traffic stop and therefore he was not under formal arrest, or its functional equivalent. When stopped for a traffic violation, a motorist expects 'to spend a short period of time answering questions and waiting while the officer checks his license and registration.' *United States v. Holt*, 264 F.3d 1215, 1220 (10th Cir.

2001).

5.      The remedy for a *Miranda* violation is limited to the exclusion at trial of

testimonial evidence.  *See Michigan v. Tucker*, 417 U.S. 433, 451-52 (1974).  In

this case, such evidence, if any, would be the Defendant's pre-arrest statement that

he is a citizen and national of Mexico without permission to be in the United

States. Such a *Miranda* violation would not result in the suppression at trial of

Defendant's fingerprints, or the evidence of his criminal and immigration history

that can be connected to him by use of those fingerprints because criminal, and

immigration history, and fingerprints are non-testimonial evidence. *See United*

*States v. Lamb* 575 F.2d 1310 (10th Cir. 1978); *See also Snow v. State of*

*Oklahoma*, 489 F.2d 278 (10th Cir. 1973), following *United States v. Dionisio*,

410 U.S. 1 (1973), and *Gilbert v. California*, 388 U.S. 263 (1967).

6.      Under the inevitable discovery exception to the exclusionary rule, illegally

obtained evidence may be admitted if the evidence would have been discovered

through independent, lawful means.  *See Murray v. United States*, 487 U.S. 533,

539 (1988).  *See also United States v. White*, 326 F.3d 1135 (10th Cir. 2003). *See*

*also United States v. Souza*, 223 F.3d 1197, 1202 (10th Cir.2000).  In this case, an

illegal seizure or *Miranda* violation would not result in the suppression of

Defendant's fingerprints, or A-file because Agents Armendariz, and Marshall

would have learned the Defendant's identity via independent, lawful means even

if he had never admitted his true name or country of origin.

7.      "The government has the burden of proving by a preponderance of the evidence

that the evidence in question would have been discovered in the absence of the

Fourth Amendment violation." *Souza* at 1203. In determining whether the

government has met its burden of proof, we consider "demonstrated historical

facts," not "speculative elements." *Nix v. Williams*, 467 U.S. 431, 444 n. 5.

(1984). The court must deny the Defendant's Motion to Suppress if the United

States proved by a preponderance of the evidence that it would have obtained his

identity, and information about his prior conviction even if the seizure which

revealed that information were illegal. In this case, the testimony was that Agent

Armendariz immediately recognized the Defendant as an illegal alien, and he was

not free to go. Whether the Defendant told Agent Armendariz anything, or not,

Agent Armendariz was going to arrest him, and transport him to the Border Patrol

Station for processing. Therefore, the Defendant's identity would have inevitably

been discovered when his fingerprints were entered into the IDENT system.

8.      "[N]ot all evidence is fruit of the poisonous tree simply because it would not have

come to light but for the illegal actions of the police. Rather, the more apt

question in such a case is whether, granting establishment of the primary

illegality, the evidence to which instant objection is made has been come at by

exploitation of that illegality or instead by means sufficiently distinguishable to be

purged of the primary taint." *Wong Sun v. United States*, 371 U.S. 471, 487-88

(1963).

9.   The Defendant's identity and the record of his prior aggravated felony conviction are not suppressible simply because "but for" an alleged illegal seizure, his identity and status as a prior aggravated felon deport were discovered. Rather, the question is whether the Border Patrol exploited that alleged illegality to discover his identity, and aggravated felony status. *Id.* at 487-89

10.  There was no illegal seizure in this case because reasonable suspicion existed when Agents Armendariz, and Marshall exited their Expedition, and approached the Chevy. *See Terry, supra.* However, even if there were an illegal seizure, the agents did not exploit the seizure to obtain the Defendant's identity, and eventually, information about his prior conviction. *See United States v. White*, 326 F.3d 1135, 1138.

11.  In connection with a brief investigatory detention based on Agent Armendariz's knowledge that the Defendant was an illegal alien, the agents asked him if he was a United States citizen, and he readily said that he was not, and that he was in the United States illegally. At that point, the agents were completely unaware of any criminal history, and only learned of his prior aggravated felony conviction when he was processed for being in the United States illegally. The information about his prior conviction was obtained from a law-enforcement database and predated any alleged illegality in the agents' conduct relating to the Defendant's arrest. *See id.* at 1138.

12.  The purpose of the exclusionary rule is in no way compromised by refusing to

suppress that information. "The exclusionary rule enjoins the Government from
benefitting from evidence it has unlawfully obtained; it does not reach backward
to taint information that was in official hands prior to any illegality." *United
States v. Crews,* 445 U.S. 463, 475 (1980).

13.     "Routine booking" questions are not considered interrogation because they are not
designed to elicit incriminating responses. *Pa. v. Muniz*, 496 U.S. 582, 600-602
(1990). Routine booking questions are reasonably related to police record-keeping
concerns and therefore unrelated to *Miranda's* concerns. *Id.* at 601-602. INS and
questions regarding nationality are likewise not designed to elicit an incriminating
response and are not interrogation. *Presley v. City of Benbrook*, 4 F.3d 405, 407-
408 (5th Cir. 1993). Agent Armendariz testified that after he arrested the
Defendant, he took him to the Border Patrol station for processing, and asked him
biographical information, and entered his fingerprints into the IDENT system.
Even though the biographical questions, and fingerprint analysis revealed
incriminating information, neither was subject to *Miranda* because each were for
purposes of law enforcement record-keeping. *id.* at 407-408.

14.     "The 'body' or identity of a defendant or respondent in a criminal or civil
proceeding is never itself suppressible as a fruit of an unlawful arrest, search, or
interrogation, even if it is conceded that an unlawful arrest, search, or
interrogation occurred." *INS v. Lopez-Mendoza*, 468 U.S. 1032, 10398 (1984).
Although the Court's statement was initially made in response to the jurisdictional

argument that respondent Lopez-Mendoza should not be subject to prosecution because his arrest was illegal, the Court reiterated the statement when addressing respondent Sandoval-Sanchez' evidentiary argument and the relative value of the exclusionary rule in deportation proceedings. *Id.* at 1043.

15.     The identity of a defendant is not itself suppressible; that is, the mere fact that a defendant was illegally brought before the court or that his identity was learned as a result of an illegal search or arrest does not mean that the Government will not be allowed to prove the defendant's identity. *See id.* at 1039.

16.     The binding law in the Fifth Circuit is that A-files may not be suppressed in a reentry case even if the district court suppresses the fingerprints used to obtain the A-file, and a confession. *United States v. Herrera-Ochoa*, 245 F.3d 495, 498 (5th Cir. 2001), *rev'd on other grounds*.

## CONCLUSION

WHEREFORE, the United States respectfully requests the Court adopt the foregoing proposed Findings of Fact, and Conclusions of Law, and deny the Defendant's Motion To Suppress Evidence.

Specifically, the United States requests the Court to make a factual finding that the "bumper to bumper" encounter between the Expedition, and the Chevy was accidental, and legal conclusions that reasonable suspicion to seize the Defendant existed when Agent Armendariz recognized him as an illegal alien, and that the Defendant was not entitled to *Miranda* because he was not in custody.

If the Court makes a factual finding that the "bumper to bumper" encounter was

intentional, the United States requests the Court to make a legal conclusion that despite the

illegal seizure, the Defendant cannot suppress his own identity, and criminal history as fruit of an

unlawful arrest.

Respectfully submitted,

DAVID C. IGLESIAS
United States Attorney

**Filed Electronically by Mark A. Saltman**

_____

Mark A. Saltman
Assistant U.S. Attorney
555 S. Telshor, Suite 300
Las Cruces, NM 88011
(505) 522-2304

I HEREBY CERTIFY that a copy of the
foregoing was mailed to defense counsel
Barbara Mandel on this ___25th___ day of June, 2004.

**Filed Electronically by Mark A. Saltman**

_____

Mark A. Saltman
Special Assistant U.S. Attorney