**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

**UNITED STATES OF AMERICA,**

    **Plaintiff,**

**vs.**                                                                                  **No. CR 04-0528 RB**

**GUSTAVO OLIVARES-RANGEL,**

    **Defendant.**

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

    **THIS MATTER** came before the Court on Defendant's (Olivares-Rangel's) Motion to Suppress Evidence (Doc. 16), filed on May 14, 2004. On June 8, 2004, I held a suppression hearing, received evidence, and heard arguments on this motion. Having considered the briefs, evidence, arguments of counsel, and being otherwise fully advised, I find that this motion should be granted.

**Findings of Fact**

    1.    Agent Luis Armendariz is an agent with the Department of Customs and Border Protection and has worked for the Border Patrol for approximately twelve and a half years. (Tr. at 4.) Agent Armendariz is familiar with the Vado, New Mexico area. (Tr. at 5.) Agent Armendariz tends to be "more proactive" in his duties, in that he actively searches for people who were previously deported. (Tr. at 4.)

    2.    Agent Mark Marshall is an agent with the Department of Customs and Border Protection and has worked for the Border Patrol for approximately seven years. (Tr. at 60.) Agent

Marshall was Agent Armendariz's partner in January and February 2004.  (*Id.*)

      3.      Agents Armendariz and Marshall arrested Olivares-Rangel on February 2, 2004. Approximately two to three weeks before the arrest, the agents apprehended an illegal alien in Berino, New Mexico.  (Tr. 61.)  On their way to the border patrol station, the illegal alien told Armendariz that some illegal aliens were living in a trailer in Vado, and possibly burglarizing homes in the area. (Tr. at 7, 62.)

      4.      Agents Armendariz and Marshall detoured to Vado, and the illegal alien informant pointed out the trailer where the supposed criminals lived.  (Tr. at 62.)  The informant did not identify the alleged illegal aliens or Olivares-Rangel by name.  (Tr. at 7.)  The agents did not corroborate the informant's information with other law enforcement officers or with residents of Vado.  (Tr. at 18-19.)  The informant was later given a voluntary return to Mexico.  (Tr. at 62-63.)
In the ensuing weeks, Agents Armendariz and Marshall made several trips to the trailer park to look for the alleged criminals, but did not encounter anyone until February 2, 2004.  (Tr. 8.)

      5.      At about 10:00 a.m. on February 2, 2004, Agents Armendariz and Marshall visited the trailer park in a white, unmarked Ford Expedition.  (Tr. at 8.)  The trailer park is located on Estancia Street, north of Presa Street.  (Tr. at 84-85.)  The agents approached the property by driving north on Estancia from Presa.  (Tr. at 47.)  Estancia is a dirt road.  (Tr. at 54.)

      6.      The trailer park is surrounded by a fence, with a gate at the entrance.  (Tr. at 25.) There is a residence near the gate and three or four mobile homes at the rear of the property.  (*Id*.) The entrance and gate to the property are clearly visible for some distance to a driver approaching on Estancia from Presa.  (Tr. 58, Def. Exhibits B, C, D.)  Agent Armendariz drove slowly and carefully on Estancia towards the driveway into the property.  (Tr. at 65-66.)

7.  Olivares-Rangel was a passenger in a green Chevy pick-up truck that was attempting to leave the trailer park at about 10:00 a.m. on February 2, 2004. (Tr. at 8-9, 50.) The entrance to the trailer park was not wide enough for two vehicles to pass side-by-side. (Tr. at 54, 80.)

8.  Agent Armendariz testified that he executed a turn into the driveway of the trailer park, and accidently met bumper to bumper with the green pick-up truck that was exiting the trailer park. (Tr. at 8-9.) Agent Armendariz testified that, if he had realized that both vehicles could not fit, he would have waited for the pick-up truck to exit the trailer park before he turned into the driveway. (Tr. at 57) Agent Armendariz testified that he immediately recognized Olivares-Rangel as someone he had arrested a month or two prior for being in the United States illegally. (Tr. at 9, 17.)

9.  Sofia Delgado lived in the first trailer near the driveway on February 2, 2004 and she witnessed the arrest of Olivares-Rangel. (Tr. at 75-76.) Ms. Delgado saw the agents' white vehicle parked on Estancia Street across the driveway and blocking the truck's exit. (Tr. at 77-78.) Ms. Delgado was a credible witness.

10. Agent Armendariz's testimony that he could not see the green truck in which Olivares-Rangel was riding before he turned into the driveway and came "bumper to bumper" with the pick-up truck is not credible because the photographs of the area and the agents' testimony demonstrate that vehicles in the driveway of the property are clearly visible as a person drives northward on Estancia Street from Presa Street. (Tr. at 57-58, Exhibits B, C, D.)

11. I find, consistent with the testimony of the disinterested witness, Sofia Delgado, that the agents simply pulled in front of, and thereby blocked the exit of, the pick-up in which Mr. Olivares-Rangel was riding. Agent Armendariz did not recognize Olivares-Rangel as a person he had

3

previously arrested and deported until after he had stopped the pick-up. (Tr. at 9, 17.)

12. When they traveled to the trailer park on February 2, 2004, the agents intended to question anyone they could find in the trailer park in an attempt to investigate the information received previously from the informant. (Tr. at 68-69.) Since the agents intended to question people and they knew there were people in the pick-up truck, and this was the first time they had seen anyone to question, I find that the agents intended to stop and question the occupants of the pick-up truck as it approached them and before it exited the driveway.

13. I find that Agent Armendariz blocked the driveway with the Ford Expedition and did not allow the green truck to exit before he questioned the occupants. (Tr. at 17.) Olivares-Rangel was not free to leave once Agent Armendariz blocked the driveway. (Tr. at 33, 42.) Agent Armendariz did not recognize Olivares-Rangel as a person he had previously arrested and deported until after he had stopped the pick-up in which Olivares-Rangel was riding. (Tr. at 9, 17.)

14. The agents questioned the occupants about their citizenship, but did not further investigate any other alleged criminal activity by them. (Tr. at 9-10.) Agent Armendariz questioned Olivares-Rangel about his identity and citizenship immediately after he seized Olivares-Rangel, without giving him *Miranda* warnings. (Tr. at 11.)

15. It was only after Agent Armendariz questioned Olivares-Rangel that Agent Armendariz verified that Olivares-Rangel was in the United States illegally. (Tr. at 10-11.) Olivares-Rangel's fingerprints were obtained at the Border Patrol station and were used to connect Olivares-Rangel to his immigration record and prior criminal record. (Tr. at 43.) These records were the bases for obtaining incriminating admissions from Olivares-Rangel and for proving the elements of the crime with which he is charged, illegal reentry after deportation. (Tr. at 10-11, 39, 43.)

16.     The information received from the informant was not corroborated or reliable and did not provide a reason for the agents to detain the occupants of the green truck. (Tr. at 66.) Agent Armendariz intended to stop the green truck as soon as he saw it, either to question the occupants about their citizenship or to investigate the unreliable tip.

## Conclusions of Law

1.      "The Fourth Amendment forbids stopping vehicles at random to inquire if they are carrying aliens who are illegally in the country, [and] also forbids stopping or detaining persons for questioning about their citizenship on less than a reasonable suspicion that they may be aliens." *United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975).

2.      Olivares-Rangel was seized when Agent Armendariz blocked the driveway and prevented the pick-up truck from leaving the trailer park. *United States v. Gama-Bastidas*, 142 F.3d 1233, 1239 (10th Cir. 1998). Prior to the stop, Agent Armendariz had no reliable information that anybody in the vehicle was committing a crime or was illegally present within the United States. Agent Armendariz stopped the vehicle in which Olivares-Rangel was riding without reasonable suspicion or probable cause. The stop and arrest violated the Fourth Amendment.

3.      The stop and subsequent arrest were illegal from the outset. I must now determine whether any incriminating statements, identifications, and evidence obtained thereafter were fruit of the illegal arrest or, instead, were obtained by "means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963); *United States v. Mendoza-Salgado*, 964 F.2d 993, 1010 (10th Cir. 1992).

4.      The Government bears the heavy burden of showing that the primary taint of the violation was purged. *United States v. Fernandez*, 18 F.3d 874, 876 (10th Cir. 1994); *Taylor v. Alabama*, 457 U.S. 687, 690 (1982). To satisfy this burden, the government must prove, from the totality of the circumstances, a sufficient attenuation or break in the causal connection between the illegal detention and the incriminating information. *United States v. Gregory*, 79 F.3d 973, 979 (10th Cir. 1996). No single fact is dispositive, but the factors set forth in *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975), are especially important.

5.      In *Brown*, the Supreme Court identified three factors relevant to determining whether statements or evidence, which officers obtain as a result of an illegal seizure, are admissible: 1) the temporal proximity of the statements to the Fourth Amendment violation; 2) the existence of intervening causes between the violation and the statements; and 3) the purpose or flagrancy of the official misconduct. 422 U.S. at 603-04. With regard to confessions, another relevant consideration is whether *Miranda* warnings were administered prior to the accused's statement. *Id*. at 603.

6.      The statements regarding identification and the fingerprints were obtained within hours after Olivares-Rangel was illegally arrested. There were no intervening events in this short period of time that would demonstrate a break between the incriminating evidence and the illegal stop and arrest. Olivares-Rangel was not advised of his *Miranda* rights prior to making the statements in the driveway. Agent Armendariz's recognition of Olivares-Rangel cannot provide a valid foundation for reasonable suspicion because it was obtained by the exploitation of the illegality of the arrest. *United States v. Shareef*, 100 F.3d 1491, 1508 (10th Cir. 1996). Based on an application of the *Brown* factors, I find that all evidence, statements, and identifications which officers obtained from Olivares-Rangel on February 2, 2004 must be suppressed as "fruit of the poisonous tree." *Wong Sun*, 371 U.S.

at 486.

    7.    The Government argues that, under the inevitable discovery doctrine, even if the initial stop and arrest were unlawful, the exclusionary rule is inapplicable if the evidence inevitably would have been discovered by lawful means. *United States v. White*, 326 F.3d 1135, 1138 (10th Cir. 2003). The Government has the burden of proving by a preponderance of the evidence that the evidence in question would have been discovered in the absence of the Fourth Amendment violation. *Id.* In this case, the Government has not proved by a preponderance of the evidence that Olivares-Rangel's identity and criminal history would have been discovered in the absence of a Fourth Amendment violation. The inevitable discovery doctrine is inapplicable.

    8.    The Government contends that a defendant's identity is never subject to suppression. "The 'body' or identity of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as a fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search, or interrogation occurred." *I.N.S. v. Lopez-Mendoza*, 468 U.S. 1032, 1039 (1984). The Fifth and Ninth Circuits have read this statement to mean that the defendant's identity is not suppressible in criminal actions. *See United States v. Roque-Villanueva*, 175 F.3d 345, 346 (5th Cir. 1999); *United States v. Guzman-Bruno*, 27 F.3d 420, 421-22 (9th Cir.1994). The Eighth Circuit has held that statements made by defendant concerning his identity, or fingerprints taken from a defendant during an illegal arrest or stop, are subject to suppression. *See United States v. Guevara-Martinez*, 262 F.3d 751, 755-56 (8th Cir. 2001). The Tenth Circuit has not addressed this issue. *White*, 326 F.3d at 1137 n. 1. Based on the fact that there was absolutely no justification for the stop in this case, I find the reasoning of the Eighth Circuit to be persuasive.

    9.    In *Guevara-Martinez*, the Eighth Circuit held that the defendant's fingerprints,

obtained by exploiting the defendant's detention following an illegal traffic stop and arrest, must be suppressed in a subsequent prosecution for being an illegal alien in the United States. In so ruling, the Eighth Circuit distinguished between jurisdictional challenges to identity evidence, *see Lopez-Mendoza*, 468 U.S. at 1039 (body or identity of alleged alien not suppressible in civil deportation proceeding), and evidentiary challenges to fingerprint evidence in criminal cases. *Guevara-Martinez*, 262 F.3d at 756. Where law enforcement officials discover the defendant's identity and connection to illicit activity solely because of the illegal detention, any evidence obtained as a result of that illegal detention should be suppressed. *Davis v. Mississippi*, 394 U.S. 721, 728 (1969). Fingerprints obtained as a result of constitutional violations and used for investigatory purposes must be suppressed in the criminal case flowing from that investigation. *Hayes v. Florida*, 470 U.S. 811, 815-16 (1985); *Davis*, 394 U.S. at 727.

      10.     As in *Davis*, *Hayes*, and *Guevara-Martinez*, the evidence of Olivares-Rangel's identity, including his name and fingerprints and the agents' knowledge of his presence in the United States, must be suppressed. Agent Armendariz had no knowledge that Olivares-Rangel was in the United States before he stopped the truck and then recognized Olivares-Rangel in it. Olivares-Rangel was illegally detained before Agent Armendariz obtained any incriminating evidence about him and before Agent Armendariz had any reason to look up Olivares-Rangel's immigration and criminal records. Just as the unlawfully obtained fingerprints obtained in *Davis* could not be used to link the defendant to evidence at the crime scene, the identity evidence that was unlawfully seized from Olivares-Rangel cannot be used to prove Olivares-Rangel's presence in the United States or to tie Olivares-Rangel to his criminal and immigration records.

      11.     Accordingly, I conclude that Olivares-Rangel was stopped and arrested without

reasonable suspicion or probable cause, and therefore all statements and fingerprints seized from him, as well as the immigration and criminal records located using that evidence of identity, cannot be used in the prosecution against him.

**WHEREFORE,**

    **IT IS ORDERED** that the Motion to Suppress is **GRANTED**.

_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**